STATE, RESPONDENT, v. TULLY, APPELLANT.

(No. 2,054.)

(Submitted September 26, 1904. Decided December, 1, 1904.)

*Courts—Jurisdiction—State and Federal Courts — Fort Missoula Military Reservation—Homicide — Statutes—Executive Orders — Instruction — Criminal Law — Argument of Counsel — Objection — Remarks of Court—Appeal—Questions Reviewable.*

1. An information stating generally that a crime was committed in Missoula county, but containing no other allegation as to venue, is sufficient; it not being necessary that it should allege that the crime was not committed on the Fort Missoula military reservation, which is situated within that county.
2. Judicial notice may be taken of the fact that the Fort Missoula military reservation is situated in Missoula county.
3. A motion in arrest of judgment must be founded on some defect in the information mentioned in Section 1922, Penal Code.
4. Extrinsic evidence cannot be received at a hearing on a motion in arrest of judgment.
5. *Held,* that neither title to, nor sovereignty over, that part of section 36, township 13, N. R. 20 W., upon which some of the buildings of Fort Missoula were erected, ever passed to the state of Montana under Act of Congress of February 22, 1889, granting land to the proposed state of Montana, and hence that the state court had no jurisdiction over a homicide committed on such part of said section 36.
6. Under Section 3150, Code of Civil Procedure, the courts take judicial notice of executive orders of the federal government creating the Fort Missoula military reservation.
7. On a criminal prosecution, the county attorney made certain statements as to what, in his opinion, the evidence showed. Objection was made to such line of argument, and the court said that the county attorney had a right to state his theory of the case, and what the evidence showed, or tended to show, as a matter of argument, but that the jury should understand that what he had said was in argument, and not as a statement of fact. *Held,* that such remarks of the court were not erroneous.

8.   Where no exception was taken to remarks of the court in ruling on an objection to an argument of counsel, the matter could not be considered on appeal.

MR. JUSTICE MILBURN dissenting in part.

*Appeal from District Court, Missoula County; F. C. Webster, Judge.*

- JOHN TULLY was convicted of murder in the first degree. From the judgment, and from the order overruling his motion for a new trial, he appeals.   Reversed.

*Mr. E. E. Hershey,* for Appellant.

*Mr. James Donovan, Attorney General,* for the State.

The court is bound to take judicial notice of the public official records of the executive department of the United States with reference to the establishment and boundaries of the Fort Missoula Military Reservation.   (Code of Civil Procedure, Sec. 3150; Sen. Ex. Doc. Vol. VI, 1881-82, Executive Doc. 167; Sen. Ex. Doc. Vol. VI, 1885-86, Executive Doc. 79; Sen. Ex. Doc. Vol. XI, 1887-88, Executive Doc. 258; see also Vol. XIX, Opinions of Attorneys General, p. 370.)   A military reservation is an act of the president, under authority of law, withdrawing so many acres of the public domain from the immediate administration of the commissioner of the public lands, that is, from sale at public auction, and by pre-emption or general private entry, and appropriating it, for the time being, to some special use of the government.   (*Ter.* v. *Burgess,* 8 Mont. 73.) The Fort Missoula Military Reservation was created by the executive orders of February 8, 1877, and of August 5, 1878, which are presumed to have been made by authority of the president of the United States.   (*Wilcox* v. *Jackson,* 13 Pet. 498; *U. S.* v. *Stone,* 2 Wall. 537; 26 Am. and Eng. Ency. Law, p. 225, note 2.)   The limits of the reservation are determined by the descriptions contained in said executive orders, and not by the occupancy of the military.   (*U. S.* v. *Stone, supra.*)

It will be observed that the reservation was created before the post buildings were erected, the land being described by reference to section numbers. If the occupation by the military constituted a reservation of the land for military purposes, there would be no necessity for an executive order or action by congress for that purpose; hence, no necessity for the recommendations made by the secretary of war to congress upon that subject. In August, 1878, it came officially to the knowledge of the war department that most of the buildings of the post were located on the east half of section 36, twp. 13 N., R. 20 W., a school section, by reason of which the secretary of war at four different times requested of congress legislation setting aside the said east half of said section 36.

It is admitted by counsel for the appellant that the offense was actually committed on section 36, a school section, but in evasion of the real question counsel says: "We do not see why section 36 could not be occupied and used by the military at Fort Missoula the same as any other portion of the public lands." For the purposes of the argument it may be admitted that it could be used and occupied, but not righfully so unless congress or the executive department of the United States had first set it aside as a military reservation; but the fact remains that such action was not taken either by congress or the executive department, and without action by one or the other section 36 remains as much outside of the reservation as does the land upon which the state capitol building is erected. The officer in command of the troops at Fort Missoula might, under certain imaginable circumstances, bring his entire command to Helena and establish a camp upon the capitol grounds. While such grounds were so rightfully occupied by him they would probably be under the "military jurisdiction," for the time being at least, of the commanding officer, just as Major Torrey stated that the portion of the school section occupied by the United States buildings was under his military jurisdiction. But the state capitol grounds would not thereby be added to the Fort Missoula reservation, and pass under the jurisdiction of the United States

courts. In other words, the question of what is the Fort Missoula reservation is not one of occupancy and use by United States troops, but one rather of title, of boundaries as fixed by executive order, of due establishment by law. The land and only that land included in the executive orders of 1877 and 1878 constitutes the Fort Missoula military reservation, whether actually occupied by troops or not, and the fact that the buildings of the post are upon other lands not included in such orders does not give the United States jurisdiction of offenses committed upon such other lands, nor deprive the state courts of jurisdiction of such offenses.

By Section 1 of Article II of the Constitution of Montana, exclusive jurisdiction of the United States is conferred over the military reservation of Fort Missoula "as now established by law." (See also, par. 17 of Section 8 of Article I, Const. U. S.) The construction of reservation buildings upon section 36 is not an establishing of the reservation upon that section in the sense in which that term is used in the Constitution, but, as heretofore stated, it can only be established by proper executive order or by act of congress. The war department recognizes that "the only right that the military department possesses to the occupied portion of section 36 is that of occupancy," and "that this right of occupancy is sustained by the post commander." There is a very broad distinction between this so-called "military jurisdiction," and the exclusive jurisdiction vested in the United States courts over military reservations. Military jurisdiction is for military purposes only, and in times of peace is always subordinate to the civil power. (20 Am. and Eng. Ency. Law, p. 619.)

MR. COMMISSIONER POORMAN prepared the following opinion for the court:

Defendant was convicted of murder in the first degree. A motion in arrest of judgment was interposed and overruled. Defendant then moved for a new trial. This motion was also

overruled. The appeal is from the judgment, and from the order overruling the motion for a new trial.

1. The information states generally that the crime was committed in Missoula county, but contains no other allegations of venue. The defendant contends that inasmuch as the court takes judicial notice of the fact that Fort Missoula military reservation is situated within Missoula county (Section 3150, Code of Civil Procedure), and that the federal courts have exclusive jurisdiction of the trial of this offense if committed thereon (Section 40 *et seq.*, Political Code; Section 1, Art. II, Constitution of Montana), the information should contain some averment that the crime, though committed within the county, was not committed on this reservation. This question as to the sufficiency of the information, and the further claim of defendant that the court erred in overruling his motion in arrest of judgment, and the further claim that the court erred in receiving evidence on the hearing of the motion in arrest of judgment, will be considered together.

(a) District courts are courts of general jurisdiction. The counties constituting each district are designated by legislative enactment. In this enactment no exception is made of reservations. The form·of information given in Section 1833 of the Penal Code contains no allegation relating to venue, except the general statement that the offense was committed within the county. Section 1841, Penal Code, specifies what must be alleged in an information. That relating to venue is contained in Subdivision 4, which reads: "That the offense was committed at some place within the jurisdiction of the court, except where the act, though done without the local jurisdiction of the county, is triable therein." Criminal actions must be tried in the county where the offense was committed (Section 16, Art. III, Constitution of Montana); and when "an offense is committed in part in one county and in part in another," or "on the boundary of two or more counties," the jurisdiction is in either county. (Sections 1564, 1565, Penal Code.) The exception named in Subdivision 4 of Section 1841, *supra,* un-

doubtedly refers to offenses committed in the manner named in said Sections 1564 and 1565.

It is true, the court may take judicial notice that this military reservation is situated within Missoula county, and that the state court has no jurisdiction of this offense, if committed thereon; yet the jurisdiction of the federal courts being exceptional, and that of state courts general, it is not necessary, in an information, to negative the jurisdiction of the federal courts. Where a statute states in detail what must be alleged with reference to venue, such allegations need not be broader than the statute.

Practically this same question was before the Supreme Court of California in *People* v. *Collins,* 105 Cal. 504, 39 Pac. 16, where the court. said: "The jurisdiction of the state being general, and that of the United States exceptional, it is not necessary to negative, in an indictment or information in the state courts, the jurisdiction of the federal courts. It is like an exception in an act creating or defining a public offense, in which case it is held that, if the exception is not necessary to the description of the offense, it need not be alleged or negatived, but is matter of defense simply."

In *Territory* v. *Burns,* 6 Mont. 72, 9 Pac. 432, this court said: "When an exception is stated in the statute, it is not necessary to negative such exception, unless it is a constituent part of the definition of the offense."

This same question relative to the error complained of was passed upon in *State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026, where the court said: "The information is in conformity with the statute. The district court has general jurisdiction of all offenses committed within the limits of the county where it sits. The allegation quoted *supra* is surplusage. If the defendant should be charged with a crime committed out of the court's jurisdiction, this is a matter to be taken advantage of at the trial. The authorities cited by counsel in the brief have reference to courts of limited jurisdiction, and have no application."

We find no reason for disturbing the decision in the *Spotted*

*Hawk Case,* but hold this information sufficient as to its allegations respecting the venue of this offense.

(b) A motion in arrest of judgment must be founded on some defect in the information (Section 2200, Penal Code) mentioned in Section 1922 of the Penal Code. One of the defects mentioned in this latter section is where it appears that the court has no jurisdiction of the offense charged therein. The only error complained of here is lack of jurisdiction, and in this the contention of defendant is not sustained. Whether the failure to demur was a waiver, within the meaning of the decision in *State* v. *Mahoney,* 24 Mont. 281, 61 Pac. 647, is immaterial. The motion was properly overruled.

(c) At the hearing on the motion in arrest of judgment the attention of the court was called to certain matters relating to the *situs* of Fort Missoula military reservation, to which reference had not been made at the trial of the case, and these matters were inserted in the record. Extrinsic evidence cannot be received at the hearing on a motion in arrest of judgment. (*People* v. *Johnson,* 71 Cal. 384, 12 Pac. 261; *Commonwealth* v. *Brown,* 150 Mass. 334, 23 N. E. 98; *King* v. *State,* 91 Tenn. 617, 20 S. W. 169; *State* v. *Creight,* 2 Am. Dec. 656.)

It is claimed by respondent that the matters to which the attention of the court was directed were only such as could be noticed judicially. However this may be, the information not being open to any objection made, and none of these matters being used or inserted in the record until after verdict, the defendant was not in any manner prejudiced; and the questions raised on the motion have here been examined and considered irrespective of any extrinsic matter.

2. The question of jurisdiction is again urged on the motion for a new trial, the defendant maintaining that the evidence shows that the offense was committed on the Fort Missoula military reservation. The evidence shows that both the defendant and the deceased were soldiers stationed at Fort Missoula, and that the homicide was committed on October 18, 1903, on Sec. 36, Twp. 13 N., R. 20 W., on the sentry beat just back of the

commissary building; that several other buildings then used by the military authorities as a part of the post of Fort Missoula were situated on this section; and that, so far as military jurisdiction goes, the commanding officer of the post was supreme over the tract of land thus occupied. Military jurisdiction, however, does not in time of peace extend to the trial of persons accused of murder, although both the defendant and the deceased were, at the time the homicide was committed, soldiers in the United States army, and the offense was committed on a military reservation. This question was considered at some length in *United States* v. *Clark,* (C. C.) 31 Fed. 710, where the authorities are reviewed and discussed.

The Constitution of the United States reserves authority in congress to exercise exclusive jurisdiction over military reserves. Section 8, Article I, in part provides: "To exercise exclusive legislation in all cases whatsover, over such district (not exceeding ten miles square), as may, by cession of particular states, and the acceptance of congress, become the seat of government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings." With reference to the term "exclusive legislation," as used in the Constitution, Justice Story, in *United States* v. *Cornell,* 2 Mason, 60, Fed. Cas. No. 14,867, says: "The Constitution of the *United States* declares that congress shall have power to exercise '*exclusive legislation*' in all 'cases whatsoever' over all places purchased by the consent of the *legislature* of *the state* in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings. When, therefore, a purchase of land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased, by the very terms of the Constitution, *ipso facto* falls within the exclusive legislation of congress, and the state jurisdiction is completely ousted.

This is the necessary result, for exclusive jurisdiction is the.
attendant upon exclusive legislation."

On the admission of Montana into the Union, sections 16 and
36 in each township not reserved were granted to the state as
school lands.    That part of the Act of Congress relating thereto
(Act February 22, 1889, c. 180) is as follows: "That upon the
admission of each of said states [Washington, North Dakota,
South Dakota and Montana], sections 16 and 36 in every town-
ship of said proposed states, where such sections or any part
thereof have been sold or otherwise disposed of by or under the
authority of any act of congress, or other lands equivalent there-
to, in legal subdivisions of not less than a quarter section, and
as contiguous as may be to the section in lieu of which the same
is taken, are granted to said state for the support of common
schools, such indemnity lands to be selected within said states,
in such manner as the legislature may provide, with the ap-
proval of the secretary of the interior.    Provided, that the six-
teenth and thirty-sixth sections embraced in permanent reserves
for national purposes shall not at any time be subject to the
grant, nor to the indemnity provisions of this act, nor shall any
land embraced in Indian, military or other reserves of any char-
acter be subject to the grants or indemnity provisions of this
act, until the reserve shall have been exhausted, and such lands
be restored to and become a part of the public domain."    (En-
abling Act (Political Code, p. lxvii) 25 U. S. Stat. 679, Sec.
10.)    By the act of admission the United States transferred to
the state full authority to exercise complete sovereignty in the
enforcement of state law over all lands and places not reserved,
though the United States retained their proprietary interest in
all lands not granted or sold.    Montana was admitted into the
Union upon "an equal footing in all respects with the original
states."    Sovereignty once vested in the state remains there,
unless by some act on the part of the state it reverts to the gen-
eral government.    (*U. S.* v. *Stahl,* Woolw. 192, Fed. Cas. No.
16,373; *Draper* v. *U. S.,* 164 U. S. 240, 17 Sup. Ct. 107, 41
L. Ed. 419.)

In *United States* v. *Bateman,* (C. C.) 34 Fed. 86, the court, in considering a question of jurisdiction of a homicide committed on the Presidio military reservation, said: "The United States were both proprietors and sovereigns of the Presidio lands till the admission of the state of California into the Union. By the act of admission, reserving only their proprietary right over these lands, they relinquished to the state their governmental or local sovereign right and jurisdiction, and were thenceforth only proprietors in the sense that any natural person owning land is a proprietor. Having so relinquished their sovereign rights, that condition remains to this day, unless the state has in some way, either directly or by implication, receded to the United States its sovereign jurisdiction. This could be done by direct cession, or by consent through its legislature to the purchase of land for such governmental purposes, and a purchase for such purpose in pursuance of such consent."

In *United States* v. *San Francisco Bridge Co.,* (D. C.) 88 Fed. 891, the court, in considering a question of jurisdiction, after quoting that part of the United States Constitution referred to above, said: "It is not alleged in the information, nor does the fact otherwise appear, that the land upon which the new San Francisco postoffice is being constructed was purchased by the United States with the consent of the state, or that political jurisdiction over the same has been otherwise ceded to the United States by the state. Upon this state of facts, it must be held that the state of California retains complete and exclusive political jurisdiction over such land; and, this being so, there can be no question that persons who commit murder, or any other offense denounced by its laws, would be subject to trial and punishment by the courts of the state. 2 Story, Const. par. 1227; *People* v. *Godfrey,* 17 Johns. 225; *Ex parte Sloan,* 4 Sawy. 330, Fed. Cas. No. 12,944; *U. S.* v. *Stahl,* Woolw. 192, Fed. Cas. No. 16,373; *U. S.* v. *Ward,* Woolw. 17, Fed. Cas. No. 16,639; *U. S.* v. *Cornell,* 2 Mason, 60, Fed. Cas. No. 14,867. In the case last cited it was said by Mr. Justice Story: 'But although the United States may well purchase and hold lands

for public purposes, within the territorial limits of a state, this does not, of itself, oust jurisdiction or sovereignty of such state over the lands so purchased.   It remains until the state has relinquished its authority over the land, either expressly or by necessary implication.' "

The question in the case at bar is not whether the general government regained sovereignty, but whether it in fact ever parted with its original sovereignty.   Section 1, Article II, of the Constitution of Montana, and Section 41 of the Political Code of Montana, provide:   "Authority is hereby granted to and acknowledged in the United States. to exercise exclusive legislation as provided by the Constitution of the United States over the military reserves of Fort Assinaboine, Fort Keogh, Fort Maginnis, Fort Missoula and Fort Shaw, as now established by law, so long as said places remain military reserves to the same extent and same effect as if said reservation had been purchased by the United States by consent of the legislative assembly of the state of Montana."   The Constitution of Montana thus acknowledges absolute sovereignty in the United States over the places named or referred to in the section of that instrument just quoted, but the state of Montana has, through its legislative assembly, gone further, and recognized absolute authority in the general government over all places subsequently acquired and used by the government for any of the purposes named in the Constitution of the United States.   (Sections 42, 43, Political Code of Montana.)   Said Section 42 consents to the purchase or condemnation by the United States of any land within the state for the purpose of erecting forts, magazines, arsenals, courthouses, postoffices and other needful buildings, and the only condition attached to this consent is that process of the state may be served in any of such places.   Said Section 43 provides, in substance, that the state gives its consent to the purchase, and exclusive jurisdiction is ceded to the United States over and with respect to any lands within the limits of the state which shall be acquired by the United States for any of the purposes described in Article I, Section 8, paragraph 17, of the

Constitution of the United States, provided that a map or plat describing such lands by metes and bounds shall be filed, etc., and that the state reserves the right to tax property of railroad or other corporations having a right of way over and upon said land.

Under these provisions of the Political Code the state consents to the purchase, condemnation or acquisition of lands by the United States. Where, however, the United States still retains its original ownership of the land, it is apparent that neither purchase, condemnation nor acquisition is necessary, but that actual occupation for any purpose indicated in these sections stands in lieu thereof. Mere occupancy of government land by the military for any purpose not indicated in the law or the Constitution would not of itself be sufficient to divest the state of the sovereignty granted to it by Congress, nor does the right reserved to serve state process on these reservations infringe on the exclusive jurisdiction of the United States.

In *United States* v. *Meagher,* (C. C.) 37 Fed. 875, the court says: "The state, in the instrument of cession, merely reserves the right to serve process upon persons within the ceded land who may have committed offenses elsewhere, and I do not understand that its purpose is to reserve a concurrent jurisdiction over the territory ceded."

The same doctrine is held in *United States* v. *Cornell,* 2 Mason, 60, Fed. Cas. No. 14,867; and in *Fort Leavenworth Railroad Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264, this language is used: "The reservation which has usually accompanied the consent of the states that civil and criminal process of the state courts may be served in the places purchased is not considered as interfering in any respect with the supremacy of the United States over them, but is admitted to prevent them from becoming an asylum for fugitives from justice."

That the state courts have no jurisdiction over this homicide, if committed on a military reservation, is well established. (Const. U. S. *supra; U. S.* v. *Cornell, supra; U. S.* v. *Clark,*

(C. C.) 31 Fed. 710; *State* v. *Kelly,* 49 Am. Rep. 620; *Lasher* v. *State,* 30 Tex. App. 387, 17 S. W. 1064, 28 Am. St. Rep. 922.)

Congress expressly provided for the punishment of murder and manslaughter committed in such places (Rev. St. U. S. Sec. 5339 *et seq.* [U. S. Comp. St. 1901, p. 3627]), and has conferred exclusive jurisdiction upon the federal courts (Rev. St. U. S. Sec. 629 [U. S. Comp. St. 1901, p. 503]). *State* v. *Kelly,* above.

A different rule applies with reference to the jurisdiction of state courts of offenses committed on Indian reservations than that which obtains with reference to military reservations. Indian reservations are not specifically enumerated or named in the Constitution of the United States above referred to, wherein the Congress retains absolute jurisdiction over certain lands and places, and the federal courts have repeatedly held "that where a state was admitted into the Union, and the enabling act contained no exclusion of jurisdiction as to crimes committed on an Indian reservation by others than Indians or against Indians, the state courts were vested with jurisdiction to try and punish such crimes." (*U. S.* v. *McBratney,* 104 U. S. 621, 26 L. Ed. 869; *Draper* v. *U. S.* 164 U. S. 240, 17 Sup. Ct. 107, 41 L. Ed. 419, and cases there cited.)

The Act of Congress granting sections 16 and 36 in each township to the state makes three classes of reservations: (1) Land not sold or otherwise disposed of; (2) lands embraced in permanent reservations for national purposes; (3) lands embraced in Indian, military and other reservations of any character. By the Act of Congress of May 26, 1864, c. 95, Sec. 14, 13 Stat. 91 (Section 1946, Rev. St. U. S.), sections numbered 16 and 36 in each township of the territory of Montana and other territories "shall be reserved for the purpose of being applied to schools in the several territories herein named, and in the states and territories hereafter to be erected out of the same."

In *United States* v. *Bisel,* 8 Mont. 20, 19 Pac. 251, the court, in referring to this Act, said: "While sections 16 and 36 were

reserved for the purpose of aiding the development of the public school system in the coming state of Montana, and, so far as their sale for the purpose of settlement is concerned, were segregated from the public domain, still the title to them and the dominion and control over them remain in the government of the United States."

Whether this Act of Congress was a mere general reservation, or was in effect a grant irrevocable without the consent of the people of the territory, as the decision in *Minnesota* v. *Batchelder,* 1 Wall. 109, 17 L. Ed. 551, was construed in the argument of counsel in the *Bisel Case,* is immaterial, for "the title to them and the dominion and control over them remain in the government of the United States," and this former Act of Congress was superseded by the subsequent Act (Montana Enabling Act), and the acceptance of statehood by the people under that Act. Moreover, the record before us practically concedes that the title to this land was in the United States at the time of the admission of the territory, and that it is still there, unless it vested in the state under and by virtue of the granting part of the Act providing for admission. This Act vests title in the state unless the lands come within the exception named. It is apparent, therefore, that the United States granted both title and sovereignty to the state, or it granted neither, for, if the land was a part of the military reservation at the time that the grant took effect, so that the title to the same did not pass, the sovereignty remains in the United States so long as such condition continues, for the congress reserves exclusive jurisdiction over military reservations. Under the terms of the grant, no land embraced in a reservation of any kind is subject thereto "until the reserve shall have been extinguished, and such land be restored to and become a part of the public domain."

Neither the term "public domain" nor "public lands" has ever been given a statutory definition. In various Acts of Congress and in the decisions of courts these terms have been used as including (1) all lands owned by the United States, whether surveyed or unsurveyed, reserved or unreserved; (2) all lands

subject to sale or other disposition under general laws; and the two terms are used interchangeably in the decisions of courts unless a different meaning seemed necessary by the terms of the law then being construed. As was said in the *Bisel Case*, "There is no statutory definition of the words 'public lands,' and the meaning of them may vary somewhat in different statutes passed for different purposes, and they should be given such meaning in each as comports with the intention of Congress in their use." (*U. S.* v. *Bisel*, 8 Mont. 20, 19 Pac. 251; *U. S.* v. *Blendaur*, 128 Fed. 910, 63 C. C. A. 636. See, also, the following United States statutes: Sections 2259, 2289, 2223 and 2380, Rev. St. [U. S. Comp. St. 1901, pp. 1388, 1362 and 1455].)

It is very apparent that the first of these definitions cannot apply to the term "public domain" as used in this Act of Congress, for land cannot be restored to the public domain if it is already a part of it. The term must therefore have reference to lands in which the public may acquire a right as lands under the jurisdiction of the land department, governed by the general laws. The use of the term "public lands" in a subsequent section would seem to sustain this construction. Section 19 of the Enabling Act (25 Stat. 682, c. 180) reads: "All lands granted in quantity or as indemnity by this Act shall be selected, under the direction of the secretary of the interior, from the surveyed, unreserved and unappropriated public lands of the United States within the limits of the respective states entitled thereto. And there shall be deducted from the number of acres of land donated by this Act for specific objects to said states the number of acres in each heretofore donated by Congress to said territories for similar objects."

Land rightfully occupied cannot be classed as unappropriated public land so long as such occupation continues. The United States had the undoubted right to appropriate and occupy this land prior to the enactment of this law, and at the time of such enactment, and the fact that the United States is the granting party does not divest them of this authority and right. This

last section quoted vests no authority in the secretary of the interior to declare lands "unappropriated" or not "otherwise disposed of," then held and actually occupied by the United States for a definite and permanent purpose, such as is specified in the United States Constitution, above quoted.

A fourth limitation is by this Section 19 placed upon this grant, by enjoining upon the secretary of the interior the duty of making the selection "from surveyed, unreserved and unappropriated public land." It appears from the record that this particular land in question was surveyed at the time of the passage of the Enabling Act, so that the floating character of these grants, until surveyed, is not an element here for consideration. The term "unappropriated" is not given a specific definition in the Act itself, and the reference of this selection to the interior department without such definition makes important the rules and decisions of that department as to when lands are there considered appropriated.

*Mather et al.* v. *Hackley's Heirs,* on review before the secretary of the interior, 19 Land Dec. Dep. Int. 48, is a case in point. In that case it appears that in 1824, in obedience to instructions from the war department, a certain piece of land was occupied by United States troops in cantonment, and that the land thus occupied was used until 1830, when it was formally reserved by executive order, but prior to this executive order, and in 1824, R. J. Hackley, who was then in possession of a part of the land, was ejected therefrom by the military. In 1826 Congress enacted a law confirming in all settlers upon lands in that locality prior to January 1, 1825, the right to purchase the land whereon they resided, etc. (Act April 22, 1826, c. 28, 4 Stat. 154.) It is claimed that Hackley, having settled upon this land prior to January 1, 1825, had the right to purchase the same, and that this right descended to his heirs. Secretary Smith, in deciding the question, says, in part: "In support of his position, counsel cites the case of *Johnson* v. *United States,* 2 Ct. Cl. 391. Johnson's claim was based upon what was known as the 'Oregon Donation Act,' and, as required by that Act, he had

settled upon and occupied the land in controversy for four years continuously, with nothing left to be done to secure patent but to make proof of the same, when the tract was forcibly taken and occupied by troops of the United States, 'without the knowledge of the president, the secretary of war, or any high officer of the government.' In that case the court held that such an occupation was not a reservation, within the meaning of the Oregon Donation Act, and could not affect the rights of the plaintiff. In the case at bar, however, the facts are very different. The tract now known as the 'Fort Brooke military reservation' was occupied under the direction of the secretary of war two years before the passage of the Act upon which the claim of the Hackley heirs is predicated. In further support of his views, counsel recites the history of Camp Stambaug, in Wyoming territory. It appears that in 1870 the secretary of war established said military post, which was laid off as a reservation, and included all the territory within one mile of the flagstaff erected at the post. In 1881 the secretary of war notified the secretary of the interior that said post, being no longer needed for military purposes, had been discontinued. In said communication he expressed the opinion that, inasmuch as there had been no formal reservation of the lands included therein by the president, the same might be restored to the public domain, as other lands, without the consent of Congress. The secretary of the interior concurred in this opinion, and said lands were treated as having been restored to the public domain by the act of abandonment, and the subsequent notification on the part of the secretary of war. I am unable to see wherein the correspondence above referred to sustains the contention of counsel, for, while it may be true that a military post established by the secretary of war may be restored to the public domain with less formality than if it had been reserved by a formal order of the president, still the secretary of war had authority to establish cantonment Brooke, and by virtue of such establishment the lands upon which it was located were not subject to entry so long as unrelinquished. Where a military post

or cantonment is established upon the public domain, whether the same be for temporary purposes or permanent occupation by the military, if it be done by competent authority, the lands included therein are not subject to entry until properly restored to the public domain. If the secretary of war has the authority to establish a military post, it follows that, during the time that the lands included therein are occupied for military purposes, they are not subject to be disposed of under the pre-emption laws. In the case of *Wilcox* v. *Jackson,* 13 Pet. 498, 10 L. Ed. 264, it is held as follows: 'The president speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. Both military posts and Indian affairs, including agencies, belong to the war department. Hence we consider the act of the war department in requiring this reservation to be made as being, in legal contemplation, the act of the president, and consequently that the reservation thus made was, in legal effect, a reservation made by order of the president, within the terms of the Act of Congress.' It is further held in said case as follows: 'But we go further, and say that, whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands, and that no subsequent law or proclamation or sale could be construed to embrace it or to operate upon it, although no reservation were made of it.' "

The principle announced in the first quotation from the *Wilcox Case,* above, is sustained in *Wolsey* v. *Chapman,* 101 U. S. 755, 25 L. Ed. 915. It is further held in the *Hackley Case* that the ejectment of Hackley from his claim was itself an appropriation thereof by the military.

In the case of *James H. T. Ryman,* on appeal to the secretary of the interior, 9 Land Dec. Dep. Int. 600, it was held, "While the war department assumes and exercises for military purposes full control over the land in question, and the military, under order of the said department, holds actual possession of it, this

department will not interfere, and Ryman's application must therefore be denied."

In the case of *Wilson Davis,* 5 Land Dec. Dep. Int. 376, it is held that although a reservation for a cantonment was not in effect declared by the president, yet the actual occupation of the land by the military authorities for the purpose of a cantonment had the effect of segregating the land from the public domain, and that such cantonment should be considered a military reservation.

It is apparent from these rules and decisions that the secretary of the interior, in making the selection required by the Enabling Act, would not regard land as unappropriated which was then "occupied by United States troops in cantonment." It is a fair construction of this congressional enactment, that it was not the intention that either title to, or sovereignty over, lands actually occupied and used as a part of a permanent military reservation should pass to the state so long as such occupancy and use was continued.

The general propositions herein discussed were considered to some extent in *Territory* v. *Burgess,* 8 Mont. 57, 19 Pac. 558, 1 L. R. A. 808, but that case was determined while Montana was still a territory, and the decision there rendered is not applicable, except in a general way, to the construction of subsequent legislative or congressional enactments or constitutional provisions; and the question there, so far as it related to jurisdiction, was rather a question between two federal courts, than one between a federal court and a state court.

Under the provisions of Section 3150, Code of Civil Procedure, the court takes judicial notice of the executive orders creating Fort Missoula reservation. These orders are dated February 19, 1877, and August 5, 1878. In neither of them is Section 36 mentioned or referred to, but the reservation thereby created is located on other and adjoining lands. If, therefore, Section 36 is a part of Fort Missoula reservation it is made so by being reserved from the operations of the grant in such manner as to prevent title passing to the state, under the Act

of Congress above quoted, or else, if title did pass to the state, the United States has, by purchase, condemnation or other means, acquired title, and by compliance with the provisions of law has become reinvested with sovereignty.

From facts admitted by the respondent, and from matters inserted in the record by the respondent, which it is claimed the court may take judicial notice of, it appears that the buildings of Post Fort Missoula were originally—probably through error —erected on the east half of section 36, instead of on the land described in the executive order creating the reservation; that the attention of the secretary of war was called to this fact in August, 1878, and that the general of the army issued orders to the post commander of Fort Missoula to prevent any encroachments upon this land; that the secretary of war repeatedly communicated to Congress the facts relative to the location of these buildings, the last of such communications being in 1889; that these buildings were used for the purposes for which they were erected from 1878 until 1889, with the knowledge and consent of the secretary of war, and under orders from the commanding general of the army to prevent any encroachments on this land. It appears from these facts that this particular land in question was in the actual occupation of the military; that the buildings used by the post were on this land; and it is admitted in the evidence that on the day this homicide was committed, in 1903, these buildings and this land were used for this same purpose.

Subdivision 32, Section 3266, Code of Civil Procedure, relating to satisfactory and disputable presumptions, says "that a thing once proved to exist continues so long as is usual for things of that nature." And it appears that this is a permanent military reservation.

Under the decisions of the interior department above quoted, this land, on abandonment by the military, would be restored to the public lands, but there is no evidence in this record that there ever was any abandonment, by nonuser or otherwise, of this particular piece of land; and, in the absence of such evi-

dence, and under the facts above stated, it is presumed that these buildings and this land continued to be used as a part of this military reservation from the year 1878 until the time of the commission of this homicide, and that neither title to, nor sovereignty over, this land passed to the state of Montana, and that the state court had no jurisdiction over this homicide.

In the consideration of this question of jurisdiction, the Act of Congress approved March 19, 1904, c. 718, 33 Stat. 143, has not been overlooked. By the terms of that Act the secretary of war is authorized to accept from citizens of Missoula, Montana, deeds donating to the United States lands for the enlargement of the Fort Missoula military reservation. These lands so donated, as referred to in the act, embrace a part of the east half of this section 36. The United States has the lawful right to quiet title to land without litigation. Furthermore, by the decision in the *Bisel Case*, above referred to, no part of section 36 has been open to private entry or settlement since the passage of the Act of 1864; and it further appears that this land has been in the actual possession and occupation of the military since 1878, and that the Act providing for the admission of Montana was not passed until February 22, 1889, 25 Stat. 676, c. 180. It is not apparent, therefore, how these deeds could in any wise affect the question of jurisdiction involved in this case.

3. During the argument of the case the county attorney made certain statements as to what, in his opinion, the evidence showed. Objection was made to this line of argument, when the court said that the county attorney, in arguing the case, had a right to state his theory of the case, and of what the evidence showed or tended to show, as a matter of argument, and the court saw no impropriety in what the county attorney had said so far, but that the jury should understand that what he had said in this respect was said as argument, not as a statement of fact. No exception was taken, and no further argument was made along this line. The defendant contends that these remarks of the court were prejudicial. They are, however, in effect, nothing more than an overruling of defendant's objec-

tion, for, had the court merely said, "Objection overruled," he would thereby have told the jury and all others who heard him that he saw no error in the remarks objected to. No exception being taken, we cannot now consider the matter. (*State* v. *Cadotte,* 17 Mont. 319, 42 Pac. 857; *State* v. *Biggerstaff,* 17 Mont. 510, 43 Pac. 709; *State* v. *Bloor,* 20 Mont. 587, 52 Pac. 611.)

This does not in any manner conflict with the decision of the court in the very recent case of *State* v. *Harness,* (Idaho) 76 Pac. 788.

4. It is contended by appellant that the evidence is insufficient to sustain a verdict of murder in the first degree. Inasmuch, however, as the judgment and order appealed from are reversed for other reasons, we do not at this time enter into any discussion as to the sufficiency of the evidence.

We think the judgment and order should be reversed, and the cause remanded.

PER CURIAM.—For the reasons stated in the foregoing opinion, the judgment and order are reversed, and the cause remanded.

MR. JUSTICE MILBURN: I dissent. I do not agree with what is said in the opinion as to the jurisdiction of the district court. I believe it has jurisdiction.

Rehearing denied February 16, 1905.