## POTHIER v. RODMAN, U. S. Marshal.

(Circuit Court of Appeals, First Circuit. June 21, 1923.)

No. 1629.

1. **Criminal law ☞242(8)—Proceedings for removal of prisoner to another district.**

    On application for a warrant for removal of a prisoner to another federal district, where he has been indicted, the judge must look into the indictment to ascertain if an offense against the United States is charged, find whether there is probable cause, and determine whether the court to which the accused is sought to be removed has jurisdiction of the offense.

2. **Criminal law ☞242(7)—Evidence admissible in proceeding for removal of prisoner to another district.**

    In a proceeding for removal of a prisoner to another district for trial, the indictment is prima facie evidence of probable cause, but not conclusive, and evidence tending to show that no offense triable in the district to which removal is sought has been committed is admissible, and its exclusion is a denial of a right secured by the statute under the Constitution.

3. **Habeas corpus ☞25(1)—Will lie to review order for removal of a prisoner to another district, when unsupported by evidence.**

    An order of a district judge for removal of a prisoner to another district for trial is reviewable on habeas corpus, when there is no substantial evidence to warrant the finding of probable cause, or, if the question of probable cause depends on the construction of a statute and written instruments, the construction given them was erroneous, or no construction of them was made.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. **United States** ⟺3—**May exercise exclusive jurisdiction over lands within a state only with consent of the state.**

While the United States may purchase or acquire lands within a state without its consent, under Const. art. 1, § 8, cl. 17, it cannot exercise exclusive political jurisdiction over any lands within a state without the consent of the state, either by consent of its Legislature to the purchase or acquisition of the lands or by a direct cession of its own jurisdiction over the same.

5. **Criminal law** ⟺97(4)—**Crime committed on Camp Lewis Military Reservation before conveyance of title to the government held not within the jurisdiction of the United States courts.**

Laws Wash. 1917, p. 2, authorizing Pierce county to condemn certain lands and donate the same to the United States for military purposes, and giving the consent of the Legislature to acquisition by the United States of title to such lands, "to be evidenced by deed or deeds of Pierce county," provides in section 20 that the consent of the state is given to the exercise by the Congress of the United States of exclusive legislation over such tracts or parcels of land "so conveyed to it: Provided, upon such conveyance being concluded, a sufficient description by metes and bounds and an accurate plat or map of each such tract or parcel of land be filed in the auditor's office of Pierce county." *Held*, that the United States did not acquire legislative jurisdiction over any of such land until the execution and filing of the deeds and plats or maps, though under war emergency legislation it took possession of and occupied portions of the same before that time, and that a crime committed therein before such acquisition of title was not an offense against the United States, nor within the jurisdiction of the United States courts.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Petition by Roland R. Pothier against William R. Rodman, United States Marshal, for writ of habeas corpus. From an order denying the writ, petitioner appeals. Reversed and petitioner discharged.

For opinion below, on petition for an order for removal to another district, see In re Pothier, 285 Fed. 632.

Davis G. Arnold, of Providence, R. I., for appellant.

Harold A. Andrews, Asst. U. S. Atty., and Norman S. Case, U. S. Atty., both of Providence, R. I., for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. The appellant, Roland R. Pothier, was indicted in the District Court for the Southern Division of the Western District of the state of Washington on the 13th day of October, 1922, for the deliberate murder, with malice aforethought, of Alexander P. Cronkhite on the 25th day of October, 1918, "within and on land theretofore acquired for the exclusive use of the United States and under the exclusive jurisdiction thereof and within the Southern division of the Western district of Washington, to wit, within and on the Camp Lewis Military Reservation," contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States. On October 19, 1922, an affidavit (Exhibit D) was filed by John J. Daly before the United States commissioner for the district of Rhode Island, wherein it was charged that Pothier had been indicted in the District Court for the Southern Division of the West-

ern District of Washington for the willful murder of Alexander P. Cronkhite on "the 25th of October, 1918, at, to wit, Camp Lewis Military Reservation, within the Southern division of the Western district of Washington, * * * in violation of section 275 of the Penal Code of the Revised Statutes of the United States"; that a bench warrant on said indictment had been issued from said District Court against him, upon which a return had been made by the United States marshal of said district that he was unable to find the defendant; and that said Pothier had theretofore "fled from said Southern division of the Western district of Washington and entered and is now in the state of Rhode Island, in the district of Rhode Island." Although the affidavit (Exhibit D) did not ask that a warrant issue for his apprehension, such a warrant was issued by the commissioner on the 19th day of October, 1922, reciting that John J. Daly "had made a complaint in writing under oath before me" and setting forth the matter therein referred to as stated in the affidavit, on which the appellant was arrested and brought before him "to answer the said complaint." What hearing, if any, was had, and what evidence, if any, was offered, before the commissioner, the record does not show, further than it is recited in the warrant of commitment, which was issued by the commissioner on the 19th day of October, 1922, committing him to jail, to wit: That "after an examination being made this day held by me, it appearing that said offense had been committed, and probable cause being shown to believe said Roland R. Pothier committed said offense as charged."

On the 6th day of December, 1922, the appellant petitioned the District Court of Rhode Island for a writ of habeas corpus, alleging, among other things, that the order of commitment was absolutely void, and that he was confined and deprived of his liberty in violation of the Constitution and the statutes of the United States, and praying that he be brought before the court for hearing, and that a writ of certiorari issue to the commissioner directing him to certify to the court "all the proceedings which took place before him and all the evidence that was offered before him in said proceedings, which resulted in the issue of said commitment." On the 7th day of December, 1922, citations were issued and served, requiring the marshal to produce the appellant before the court for hearing on the 11th day of December, 1922, and show cause why said petition should not be granted, and directing the commissioner to certify to the court all the proceedings had before him and all the evidence offered in said proceedings. On December 6 the United States district attorney filed a petition asking for an order directing the removal of the appellant to the Southern division of the Western district of Washington, agreeably to the provisions of section 1014 of the Revised Statutes of the United States (Comp. St. § 1674). On this petition the court, on the 7th day of December, 1922, issued a citation, returnable December 11, 1922. On December 11, 1922, a hearing was had upon the petition for a writ of habeas corpus and for a writ of certiorari, and on the petition for an order of removal. Evidence having been offered in support of the respective contentions of the parties, the court took the matter

under advisement. On January 11, 1923, the District Judge filed an opinion in which he stated:

"It apearing that the indictment was by a court of competent jurisdiction, that there was probable cause for his commitment by the commissioner, and that his imprisonment, restraint, and detention were in accordance with law—
"The petition is denied."

On the same day the court also filed an opinion with reference to the petition for removal in which he directed that a warrant for removal issue in accordance with the prayer of the petition; it having been ruled by the court that—

"the defendant has failed to overcome the prima facie case made by the indictment, and that the evidence fails to show the want of probable cause."

An appeal was taken directly to the Supreme Court, but, inasmuch as the question at issue did not relate to the jurisdiction of the District Court of Rhode Island, but went to the merits of the controversy, the case was transferred to this court.

The crime charged in the indictment is not for a violation of section 275 of the Penal Code (Comp. St. § 10448), as stated in the affidavit filed with the commissioner and referred to by him as a complaint, but for a violation of section 272, paragraph 3 (Comp. St. § 10445), and section 273 of the Penal Code (Comp. St. § 10446). Section 275 simply prescribes the penalty for the offenses defined in sections 272, 273 and 274. Sections 272, 273, and 275 read as follows:

"Sec. 272. The crimes and offenses defined in this chapter shall be punished as herein prescribed: * * *
"Third. When committed within or on any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the Legislature of the state in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."
"Sec. 273. Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premediated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree."
"Sec. 275. Every person guilty of murder in the first degree shall suffer death. * * *"

The Constitution of the United States (article 1, § 8, cl. 17) reads as follows:

"Section 8. The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, Dockyards, and other needful buildings."

The indictment, as above stated, charged that the appellant, on October 25, 1918, deliberately and with malice aforethought shot Alexander P. Cronkhite—

"within and on lands theretofore acquired for the exclusive use of the United States and under the exclusive jurisdiction thereof, and within the Southern division of the Western district of Washington, to wit, within and on the Camp Lewis Military Reservation."

There is no dispute that Cronkhite was killed on the Camp Lewis Military Reservation on the date named, or that the reservation was within the Southern division of the Western district of the state of Washington. The appellant denies that he committed the crime, and contends that the evidence introduced before the court at the hearing on the petition for a writ of habeas corpus and for an order of removal to the state of Washington shows that, at the time when Cronkhite was killed, the land constituting Camp Lewis Military Reservation had not been acquired by the United States; that the sovereignty of the state of Washington over it had not been abdicated, and had not become vested in the government of the United States; that he had therefore not committed a crime against the United States as charged in the indictment, and that the District Court for the Southern Division of the Western District of Washington was without jurisdiction over the offense.

Inasmuch as this was the question desired to be litigated on this appeal, and the evidence bearing upon the questions at issue on the petition for removal had not been heard or the order of removal entered at the time the habeas corpus application was filed, it was agreed between the parties, in order to avoid the delay that would be occasioned by bringing another petition for a writ of habeas corpus to test the validity of the order, that the present petition for such a writ should be treated as having been brought after the order of removal was entered and with like effect.

[1, 2] It has been held in this circuit in Hastings v. Murchie, 219 Fed. 83, 88, 134 C. C. A. 1, following the decisions in Tinsley v. Treat, 205 U. S. 20, 27 Sup. Ct. 430, 51 L. Ed. 689, and United States v. Black, 160 Fed. 431, 87 C. C. A. 383, that under section 1014 of the Revised Statutes of the United States (under which the order of removal in this case was made), when an offender against the United States has been indicted in a district in a state other than the district of arrest, then, after the offender has been committed, it becomes the duty of the District Judge, on inquiry, to issue a warrant of removal; that the inquiry which the judge is called upon to make involves judicial discretion; that he must look into the indictment to ascertain if an offense against the United States is charged, find whether there was probable cause, and determine whether the court to which the accused is sought to be removed has jurisdiction of the same; that, on such hearing, the indictment, though prima facie evidence of probable cause, is not conclusive; that evidence tending to show that no offense triable in the district to which removal is sought had been committed in that district should be received; and that to decline to receive it involved the denial of a right secured by the statute under the Constitution.

In this case the District Judge received the evidence bearing upon the question whether there was probable cause to believe that the ap-

pellant had committed the crime charged on land within Camp Lewis Military Reservation, within the exclusive jurisdiction of the United States in the Southern division of the Western district of Washington, and found that there was probable cause to believe that he had committed such crime against the United States within that district, and that the District Court of the Southern Division of the Western District of Washington had jurisdiction of the offense.

[3] The removal statute (section 1014) does not provide that the decision of the District Judge ordering the removal of an offender shall be final; but if we assume it to be final where the offender has been accorded a fair hearing on substantial evidence, and that, in such a case, the order of removal and proceedings thereunder would not be reviewable on habeas corpus, yet we do not understand that, if his findings are so entirely unsupported by evidence as to be unreasonable and to constitute an abuse of discretion and a denial of due process of law, they may not be so reviewed. In fact, it had been so held in this circuit in Ex parte Petkos (D. C.) 212 Fed. 275, 277, which was a case relating to an order of deportation of an alien by the Secretary of Commerce and Labor under a statute expressly making the findings of the Secretary final, which decision was sustained in its main features on appeal to this court. United States v. Petkos, 214 Fed. 978, 131 C. C. A. 274. And in the case of Gonzales v. Williams, 192 U. S. 1, 24 Sup. Ct. 171, 48 L. Ed. 317, where the petitioner, a citizen of Porto Rico, had been remanded to the custody of the United States Commissioner of Immigration for deportation under the Immigration Act of March 3, 1891 (26 Stats. at Large, 1084), as an alien immigrant, the court, on habeas corpus, reviewed the question whether the petitioner, in view of the facts found, was an alien immigrant within the meaning of the act, and held that the "Commissioner had no jurisdiction to detain and deport her by deciding the mere question of law to the contrary, and she was not obliged to resort to the superintendent or the Secretary," in order to enable her to maintain her petition. In United States v. Sing Tuck, 194 U. S. 161, at page 168, 24 Sup. Ct. 621, at page 623 (48 L. Ed. 917), Mr. Justice Holmes, in speaking of the case of Gonzales v. Williams, said:

"There was no use in delaying the issue of the writ until an appeal had been taken, because in that case there was no dispute about the facts but merely a question of law."

And in other cases under the Immigration Act where the party ordered deported as being an alien brought a petition for a writ of habeas corpus, alleging and claiming that he was a citizen of the United States, it has been held that his citizenship, although it involved a question of fact, could be inquired into on habeas corpus, as his rights as a citizen were protected by the Constitution. And even where the applicant ordered deported was not and did not claim to be a citizen of the United States, it has been held that he might have reviewed on habeas corpus the findings of the executive officers of the government, if such findings were not authorized by the act or were not sustained by substantial evidence. Zakonaite v. Wolf, 226 U. S. 272, 274, 33 Sup. Ct. 31, 57 L. Ed. 218; Kwock Jan Fat v. White, 253 U. S. 454,

457, 40 Sup. Ct. 566, 64 L. Ed. 1010; Skeffington v. Katzeff (C. C. A.) 277 Fed. 129. And in this circuit, in the last-named case, it was held that, while the findings of fact by the executive officers are final, yet, if such findings are not authorized by the act or are not sustained by substantial evidence, they may be reviewed and reversed on habeas corpus.

If, in deportation proceedings where the rights of aliens are involved, the findings of the executive officers may be reviewed on habeas corpus, where there is no substantial evidence to support the findings, we think that in removal proceedings, where the rights of citizens are at stake, review may be had when there is no substantial evidence to warrant the finding of probable cause by the District Court, or where, on all the evidence produced before the court, no other conclusion could be reached than that there was want of probable cause, or, what is the same thing, if the question of probable cause depends upon the construction of a statute and written instruments, and the construction given them was erroneous or no construction of them was made. In all such cases the question presented would be one of law, the determination of which would disclose whether the alleged offender was unlawfully restrained of his liberty by the order of removal. See, also, Mitchell v. Dexter, 244 Fed. 926, 157 C. C. A. 276 (1st Cir. 1917).

[4] We have before us in this case all the evidence presented at the hearing before the District Judge on the petition to remove, which includes the indictment, the testimony of four fact witnesses, correspondence between the Secretary of War and the attorney of the county commissioners of Pierce county in the state of Washington, and the act of the Legislature of that state authorizing Pierce county as an arm of the state to acquire by condemnation or purchase land in the vicinity of seventy thousand acres located in the state, and donate the same to the United States for a military reservation. We have cited the sections of the statute under which the indictment was brought and the provisions of the Constitution disclosing the way in which the general government may acquire title to land in a state and obtain the power of exclusive legislation over the same. The leading case in the Supreme Court construing this provision of the Constitution and section 272 (paragraph 3 of the Penal Code) is Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264. It was there said:

"This power of exclusive legislation is to be exercised, as thus seen, over places purchased, by consent of the Legislatures of the states in which they are situated, for the specific purposes enumerated. It would seem to have been the opinion of the framers of the Constitution that, without the consent of the states, the new government would not be able to acquire lands within them; and therefore it was provided that when it might require such lands for the erection of forts and other buildings for the defense of the country, or the discharge of other duties devolving upon it, and the consent of the states in which they were situated was obtained for their acquisition, such consent should carry with it political dominion and legislative authority over them. Purchase with such consent was the only mode then thought of for the acquisition by the general government of title to lands in the states. Since the adoption of the Constitution this view has not generally prevailed. Such consent has not always been obtained, nor supposed necessary, for the purchase by the general government of lands within the states. If any

doubt has ever existed as to its power thus to acquire lands within the states, it has not had sufficient strength to create any effective dissent from the general opinion. *The consent of the states to the purchase of lands within them for the special purposes named is, however, essential, under the Constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion.* Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals."

And it was there held that the state might cede its exclusive jurisdiction over land acquired by the federal government within the state directly by an act of the Legislature expressly so stating, or indirectly when the purchase by the United States was with the consent of the Legislature of the state, and that, where the Legislature directly ceded its sovereignty over land within the state by a formal act of cession, it might reserve the right to execute civil and criminal process within the ceded land issued under its authority for acts done within and cognizable by the state, notwithstanding the cession. But once the cession of sovereignty was made over lands within a state purchased by the United States for one of the purposes designated in the statutes and Constitution, "such consent under the Constitution operates to exclude all other legislative authority." The court also recognized in its opinion that the right of sovereignty of a state over land purchased by the United States within its boundaries were not to be taken away by implication; that the essence of the provision of the Constitution here under consideration was "that the state shall freely cede the particular place to the United States for one of the specific and enumerated objects. This jurisdiction cannot be acquired tortiously or by disseizin of the state; much less can it be acquired by mere occupancy, with the implied or tacit consent of the state, when such occupancy is for the purpose of protection" (People v. Godfrey, 17 Johns. [N. Y.] 225); that "where * * * lands are acquired in any other way by the United States within the limits of a state than by purchase with her consent, they will hold the lands subject to this qualification: That if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed." And it was held that, inasmuch as the land constituting the Ft. Leavenworth Military Reservation was not purchased by the United States after Kansas became a state, but 'was acquired by it by cession from France many years before, whatever political sovereignty or dominion the United States had over the place came from the cession of the state since its admission into the Union.

[5] In this case there is no claim that the United States had acquired or reserved title to the land embraced within the limits of Camp Lewis Military Reservation before or at the time Washington became a state. The evidence shows that its title was acquired subsequent to

that time. Unless it had acquired title with the consent of the state at the time Cronkhite met his death on the military reservation, the crime of murder charged in the indictment was not an offense against the United States.

The District Court in passing upon this question apparently entertained the view that, inasmuch as the evidence showed that before the delivery of the deed and its acceptance by the Secretary of War the United States military authorities had entered upon some of the land acquired by the county and erected buildings and occupied the same with 50,000 men, the state thereby yielded up its sovereignty and the United States acquired exclusive jurisdiction over the land thus occupied, and that, this being so, the prima facie case of probable cause made by the indictment was not overcome. But, as we have seen above, this evidence had no tendency to show that the state had ceded its sovereignty, as the state's right of sovereignty is not to be taken away by implication.

An examination of the act of the Legislature of Washington of 1917 (Laws Wash. 1917, p. 2), under which Pierce county was authorized to acquire and to donate the land here in question, discloses that it was drawn with great care. It recites that the Secretary of War, with the approval of the President of the United States, had agreed on behalf of the federal government to establish in Pierce county, Wash., a permanent mobilization, training, and supply station, *on condition* that land in Pierce county aggregating approximately 70,000 acres, at such location or locations as have been or may be hereafter, from time to time, selected or approved by the Secretary of War, *be conveyed* to the United States, with *the consent* of the state of Washington, free of cost to the United States. In section 2 there was imposed upon Pierce county an indebtedness not to exceed $2,000,000 and the obligation to acquire by condemnation or otherwise land in Pierce county for the purpose above named and convey all such lands to the United States to be used for that purpose. Section 3 provided for the issuing of bonds for the indebtedness. In sections 4, 5, 6, and 7 provision was made for the assessment of taxes and the payment of the bonds and interest, and in sections 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 the power of eminent domain was given for the acquisition of the lands and the mode of procedure thereunder pointed out in great detail. Section 20 reads as follows:

"Sec. 20. Pursuant to the Constitution and laws of the United States, and especially to paragraph 17 of section 8 of article 1 of such Constitution, the consent of the Legislature of the state of Washington is hereby given to the United States *to acquire* by donation from Pierce county, title to all lands herein intended to be referred to, *to be evidenced by the deed or deeds of Pierce county signed by the chairman of its board of county commissioners and attested by the clerk of such board under the seal of such board,* and *the consent* of the state of Washington *is hereby given to the exercise by the Congress of the United States of exclusive legislation* in all cases whatsoever *over such tracts or parcels* of land *so conveyed* to it: *Provided, upon such conveyance being concluded* a sufficient description by metes and bounds and an *accurate plat or map* of each such tract or parcel of land *be filed in the auditor's office of Pierce county, together with copies* of the orders, *deeds,* patents or other evidences in writing *of the title of the United States:* and provided, that all civil process issued from the courts of this state and such

criminal process as may issue under the authority of this state, against any person charged with crime in cases arising outside of said reservation, may be served and executed thereon in the same mode and manner and by the same officers as if the consent herein given had not been made."

It is apparent that this section read in the light of the surrounding circumstances, means that the sovereign right of the state of Washington over the land in question and the acquisition of exclusive legislative authority and jurisdiction by the United States thereover was not to take place when the land had been conveyed by deed, but only when, upon such conveyance being concluded, a sufficient description by metes and bounds and an accurate map of each such tract or parcel of land, together with copies of orders, deeds, patents and other evidences of title, had been filed for record in the auditor's office of Pierce county. The deed was not executed and acknowledged until the first day of October, 1919, when it was signed and acknowledged by the board of county commissioners for Pierce county and accepted on behalf of the United States of America, by Newton D. Baker, Secretary of War, and it was not recorded in the office of the auditor of Pierce county until November 15, 1919.

The correspondence in the case indubitably shows that the parties understood and acted upon the idea that no title was to pass to the United States until the deed was delivered and accepted by the Secretary of War (see letters of December 2, 1916, and June 21, 1918), and the acts of Congress show that down to July 2, 1917, no public money could be expended upon any land acquired by the United States (much less to be acquired) for the purpose of erecting thereon any armory, arsenal, fort, fortification, navy yard, etc., until the written opinion of the Attorney General had been had in favor of the validity of the title, "nor until the consent of the Legislature of the state in which the land or site may be, to such purchase, has been given." Rev. Stat. § 355 (Comp. St. § 6902). See letter of December 2, 1916, Exhibit C, written prior to July 2, 1917. On July 2, 1917, the Secretary of War was given authority to purchase or condemn land for fortifications, coast defenses and military training camps or to enter into contracts for the use of the same for such purposes and to "accept donations of land and the interest and rights pertaining thereto required for the above-mentioned purposes," and it was further provided:

"That when such property is acquired in time of war or the imminence thereof upon the filing of the petition for the condemnation of any land, temporary use thereof or other interest therein or right pertaining thereto *to be acquired* for any of the purposes aforesaid, *immediate possession thereof may be taken to the extent of the interest to be acquired and the lands may be occupied and used for military purposes*, and the provision of section three hundred and fifty-five of the Revised Statutes, providing that no public money shall be expended upon such land until the written opinion of the Attorney General shall be had in favor of the validity of the title, nor until the consent of the Legislature of the state in which the land is located has been given, shall be, and the same are hereby, suspended during the period of the existing emergency." Act of July 2, 1917, 40 Stat. at Large, 241; Act of April 11, 1918, 40 Stat. at Large, 518 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6911a).

See letter of July 1, 1918, where it says: "Prior to the expiration of the existing war."

This shows plainly the circumstances under which the authorities of the general government entered upon a portion of the land and expended money in the erection of buildings thereon in advance of having obtained title thereto or the approval of title by the Attorney General, and without having obtained the consent of the state.

We are of the opinion that no other conclusion can be drawn from the evidence than that, at the time the crime charged in the indictment was committed, the United States had acquired no title in the land embraced within Camp Lewis Military Reservation; that the sovereignty of the state over the tract had not then been yielded up and was not until the deed, map, etc., were filed in the office of the county auditor of Pierce county for record, which was not until November 15, 1919, more than a year after the alleged murder. This being so, there is an absolute want of probable cause for the removal of the appellant to answer to the crime charged. Greene v. Henkel, 183 U. S. 249, 261, 22 Sup. Ct. 218, 46 L. Ed. 177.

The order of the District Court directing the removal of the appellant is reversed, and the petition for an order of removal is denied. The decree of the District Court, dismissing the petition for a writ of habeas corpus, is reversed, and it is ordered that the appellant be discharged from custody.