STATE ex Rel. BOARD OF COUNTY COMMISSIONERS
OF VALLEY COUNTY, Relator, v. BRUCE et al., Re-
spondents.

(No. 7,784.)

(Submitted January 31, 1938. Decided March 14, 1938.)

[77 Pac. (2d) 403.]

*Messrs. Booth & Booth,* for Relator, submitted an original and a reply brief, and argued the cause orally.

*Mr. Thomas Dignan,* County Attorney of Valley County, and *Mr. Otis A. Hallett,* Assistant County Attorney, joined by Attorney General *Harrison J. Freebourn,* appearing in behalf of a large number of taxpayers of Valley County, permitted to appear as interveners, submitted a brief; *Messrs. Dignan* and *Hallett,* and Assistant Attorney General *E. K. Matson,* argued the cause orally.

*Mr. John M. Kline* and *Mr. C. H. Roberts,* for Interveners P. C. Vornholt, Rexall Drug Store et al., submitted an original and a supplemental brief; *Mr. Kline* argued the cause orally.

*Mr. E. G. Toomey* and *Mr. John W. Chapman,* for Interveners Fort Peck Civic Association, and School District No. 21 of Valley County, submitted a brief; *Mr. Toomey* argued the cause orally.

*Mr. Thomas A. Marron,* representing the Respondents, argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an original proceeding brought by the relator, the Board of County Commissioners of Valley County, as such, seeking a writ of mandate against the county assessor and the county treasurer, commanding them to levy and collect taxes in accordance with the statutes of this state upon personal property owned by persons and private corporations located within the townsite of Fort Peck, and other lands belonging to the United States acquired for the Fort Peck Dam. The sheriff of Valley county is made a party defendant, and a like writ is sought commanding him to enforce the license laws of this state against persons, firms and businesses located in the same area.

A similar proceeding was before this court, brought by the same relator, against the assessor and treasurer, seeking the same relief, which was denied, in the case of *State ex rel. Board of Commrs.* v. *Bruce,* 104 Mont. 500, 69 Pac. (2d) 97. Since the decision in that case some three cases have been decided by the Supreme Court of the United States, which, it is argued, are controlling here and lead to a different conclusion from that announced in the former case.

The respondents have filed answer to the application for the writ. Certain persons, whose property or businesses would be subject to taxation or the payment of licenses, have by leave of

court filed complaints in intervention. Other interested parties have, through counsel by leave of court first had, appeared as *amici curiae,* and were heard by the court. There is no dispute as to the essential facts on the face of the various pleadings. The facts in this case are in most respects identical with those appearing in the former proceeding, although some additional facts are found in the proceeding here.

In the former case, after the denial of a petition for rehearing, a petition to reopen the case under the provisions of section 9187, Revised Codes, was filed. That petition sought to bring to the attention of the court the same additional facts which are found in the pleadings in this case. By that petition, the briefs filed in support of it, and by the briefs and arguments here, it is sought to secure a re-examination of certain propositions which were settled in the former opinion, and could in nowise be affected by the recent decisions of the Supreme Court of the United States.

It is here argued that the former decision is *res judicata;* also, that under the rule of *stare decisis,* the former opinion is controlling. These contentions present serious questions, but in view of our conclusions we shall assume for the purpose of this opinion, but without so deciding, that neither the plea of *res judicata* nor the rule of *stare decisis* is of binding force in the consideration of this case. However, since some of the questions decided in the former opinion have not been here reargued, let it be understood that we are adhering to what was said in the former opinion, unless expressly modified herein.

The statement of the case appearing in the former opinion states the facts disclosed here, except certain additional facts which we shall presently notice. Hence we will not restate what was there said with reference to the facts.

We decided in 'the former opinion that section 25, Revised Codes, was the controlling Act of cession until the approval of section 25.1 on January 17, 1934. Since section 25 contains no reservation of the right in the state to tax, whereas section 25.1 contains such a reservation, much of the controversy involves the question as to which of these Acts of cession prevails.

We determined the facts to be in the former case that the lands in the townsite of Fort Peck were acquired by the United States securing options to purchase in the fall of 1933 from the owners of these lands; that while these options were in force possession was taken with the consent of the owners, and improvements were made on the lands by the United States; and that later, and after the enactment of section 25.1, title was conveyed and the purchase price paid in accordance with these options. The facts now presented are much more in detail covering this same subject. The property which is sought to be taxed, and the businesses which are sought to be licensed, are in or on the townsite of Fort Peck. This townsite is located on lands purchased from Chester T. Taylor, Peter Maxness, and the state of Montana. Ninety-four per cent. of the townsite lies on lands acquired from Taylor.

On November 11, 1933, Taylor executed, for a recited consideration, an option to purchase his lands to the United States for $23,500. It provided: "This option to be exercised by giving me notice of acceptance within thirty days, * * * possession to be given immediately upon notice of acceptance." On December 1, 1933, and thereafter, the United States took exclusive possession of these lands with the consent of Taylor, and continued in possession of them thereafter. During the month of December, 1933, improvements were made on the lands by the United States. On November 29, 1933, authority to purchase and take possession of these lands was requested of the Secretary of War, which was granted on December 28, 1933. The acts in taking possession were ratified at that time by the Secretary of War. Later, on February 10, 1934, a contract for the sale of the same lands for the same price was executed by Taylor to the United States. Deeds for the lands were executed and delivered on April 11, 1934, June 16, 1934, and January 5, 1935. The title to an 80-acre tract of the Taylor lands was based on a tax title, which the Department of Justice failed to approve. A friendly condemnation suit was brought as to this tract, the award being the contract price. The decree was recorded November 2, 1935. The other tract, owned by an individual, was

acquired by the United States in a similar manner, except that no condemnation proceeding was involved. The dates of the options, taking of possession, erection of improvements, consent to the purchase, and ratification of the taking of possession in both instances were substantially the same. All conveyances of title were made after the effective date of section 25.1.

The state lands were acquired in the following manner: On November 7, 1933, the State Land Board was notified of the necessity of the United States obtaining title to those lands. This board passed a resolution on November 17, 1933, authorizing the United States and its agents to enter upon the lands and conduct any work, operation or activity relating to the construction of the Fort Peck project, subject to the rights of a lessee who gave his consent to the occupation of these lands by the United States. On December 1, 1933, exclusive possession was taken of these lands and improvements were begun thereon. On February 6, 1934, a definite price for them was offered by the United States, which was accepted February 16 of the same year, and patent was issued therefor on June 8 following.

It is argued that the options were not binding contracts in themselves and expired before acceptance, and in any event the lands were not purchased until the conveyances of title were executed, and that therefore the lands were purchased after the effective date of section 25.1.

An option contract, when accepted within the time and in the manner provided, becomes a valid contract upon which specific performance may be had. (*Torelle* v. *Templeman,* 94 Mont. 149, 21 Pac. (2d) 60.) Acceptance of an option may be implied from the acts and conduct of the parties, as by taking possession, or the making of improvements on the property. (66 C. J. 501; *Curran* v. *Rogers,* 35 Mich. 221; *Clark* v. *Harmer,* 5 App. D. C. 114; *Harless* v. *Petty,* 98 Ind. 53; James on Option Contracts, sec. 827.) The record contains no proof of notice in accordance with the option, but possession was to be surrendered upon notice of acceptance. Possession was surrendered while the option was in force. Accordingly, the notice must either have been given or waived. The option

did not specify that the notice must be in writing; it could be given verbally as well as by formal writing.

When the United States went into possession under these options and made improvements upon the premises, it accepted the options, and thereby a binding contract to purchase resulted. A suit could be maintained on this binding obligation the terms of which were found in the option, against the United States under the Tucker Act, 24 Stat. 505, 28 U. S. C. A., sec. 41, subd. 20. (See *Hurley* v. *Kincaid*, 285 U. S. 95, 52 Sup. Ct. 267, 76 L. Ed. 637.)

It is contended that these lands were not purchased within the meaning of Article I, section 8, clause 17, of the federal Constitution; that, in order for a purchase to be made within the meaning of the Constitution, a full and complete title must be conveyed to and vested in the United States. The word "purchase" as used in the statute (43 U. S. C. A., sec. 11), prohibiting certain governmental employees from becoming interested in the purchase of public lands, was construed as meaning "inclusive of the various modes of securing title to or rights in public lands." (*Waskey* v. *Hammer*, 223 U. S. 85, 32 Sup. Ct. 187, 189, 56 L. Ed. 359.) The word "purchase" used as a verb is defined "to obtain or secure as one's own by paying or promising to pay a price." (New Standard Dictionary; *First Nat. Bank* v. *United States*, 38 Fed. (2d) 925; 51 C. J. 95.)

We pointed out in our former opinion that the work on the Fort Peck project was authorized by the laws of the United States. The Missouri River is a navigable stream. The Secretary of War was authorized to purchase lands needed to enable him to maintain, operate or prosecute works for the improvement of rivers for which provision had been made by law, at a price fixed by the owner of the land which, in the opinion of the Secretary of War, is reasonable, without further delay. (25 Stat. 94, 33 U. S. C. A., sec. 591.) Hence, before the enactment of section 25.1 there was a valid, enforceable contract to pay for the lands of the individuals at an agreed price, giving the right to the United States to occupy and use these lands

exclusively for its own purposes. The United States had thereby purchased these lands.

The United States had acquired the right to possess, enjoy, and occupy the state lands, and was exercising these rights. True, the method of arriving at a price was not fully determined, nor the manner of completing the conveyance. Notwithstanding these deficiencies the United States had purchased these lands within the meaning of the word "purchase" as used in the federal Constitution.

It is argued that the Act of cession found in section 25 never ▮ became operative in that no map or plat was filed with the proper local authority. It is said the requirement in that respect is in effect a condition precedent to the Act of cession becoming operative. The same argument was made on the hearing in the former case, but we declined to accept or follow it. Now our attention is invited for the first time to certain decisions under somewhat similar statutes, where a conclusion in variance with our former holding was announced.

In the case of *Six Companies* v. *De Vinney*, 2 Fed. Supp. 693, an Act of cession of the state of Nevada was under consideration, containing a like provision with reference to the filing of a map or plat. The Act was held inoperative on two grounds. First, the lands were not purchased or acquired by condemnation, and, hence, were without the provisions of the Act. Second, that the map or plat was not filed, and, therefore, the Act was inoperative as an Act of cession. The first ground disposed of the case; however, the court in deciding the second point, based its opinion upon the rule that statutes relinquishing jurisdiction are strictly construed, in conformity with the decision in the case of *Larson* v. *South Dakota*, 278 U. S. 429, 49 Sup. Ct. 196, 73 L. Ed. 441.

However sound this latter rule may be, our course must be otherwise. Section 25 is a part of our Codes. It has been so ever since their first adoption. Section 4, adopted as a part and parcel of the same Codes, declares: "The codes establish the law of this state respecting the subjects to which they relate and their provisions and all proceedings under them are to be

liberally construed with a view to effect their objects and to promote justice.'' Giving heed to this legislative command, we may not strictly construe section 25.

In the case of *State* v. *Mendez*, (Nev.) 61 Pac. (2d) 300, it was held that the filing of the map under the Nevada Act of cession was a condition precedent to its effective operation. The rule of strict construction of the statute in the case of *Six Companies* v. *De Vinney*, supra, was followed.

The case of *Pothier* v. *Rodman*, (1 Cir.) 291 Fed. 311. 319, involved an Act of cession by the state of Washington over lands to be donated by Pierce county to the United States. The Act provided the precise method of conveyance to be followed. Exclusive legislation over the lands ''so conveyed'' to the United States ''provided, upon such conveyance being concluded * * * an accurate plat or map * * * be filed in the auditor's office of Pierce county, together with copies of the orders, deeds, patents or other evidences in writing of the title of the United States.'' (Laws Washington 1917, p. 14, sec. 20.) The court concluded that exclusive jurisdiction did not vest until the filing of the map. The Act required the concurrent filing of the map with the conveyance, and no exclusive jurisdiction could vest until the conveyance had been made under the terms of the Act.

In section 25 no time is expressly mentioned when the map shall be filed, nor by whom. If the legislature desired to make the filing of the map a condition precedent to the vesting of exclusive jurisdiction, it could have done so by apt language. In a like Act of cession of the Glacier National Park (sec. 22), jurisdiction did not vest until the United States, through the proper officers, notified the Governor that it assumed police or military jurisdiction over the park. The same provision is found in the Act of cession over Yellowstone National Park (sec. 23).

Construing this statute liberally, with the view of effecting its object, namely, to cede exclusive jurisdiction to the United States over all lands acquired by the United States for any of the purposes mentioned in Article I, sec. 8, clause 17, of the

332

federal Constitution, we may not declare that the provision with reference to the filing of a map or plat was a condition precedent to the Act becoming operative. However, a strict construction would doubtless lead to a different result. We, in our former opinion, considered at length what, if any effect, the use of the word "provided" had in creating a condition precedent, and now adhere to what we there said on the subject.

It is said that section 25 was never intended by the legislature ██ ██ as an Act of cession, so far as the property in question is concerned. This contention has for its basis the title of the Act when the section was first enacted. (Laws 1893, p. 51.) The language of the statute is plain and unambiguous with reference to the purpose of the use of the property to be acquired. The ambiguity, if any, is in the federal Constitution. We concede the rule to be that, if the language of the statute needs construction, resort may be had to its title as an aid. If the legislative intention can be determined from the plain meaning of the words of the statute, the court may not apply other means of interpretation. (*Murray Hospital* v. *Angrove,* 92 Mont. 101, 10 Pac. (2d) 577; *State ex rel. Du Fresne* v. *Leslie,* 100 Mont. 449, 50 Pac. (2d) 959, 101 A. L. R. 1329.) Nor may the fact that the title of the Act was deficient, in that it was more narrow than the body of the Act, now be asserted against its validity, since it has been adopted as a part and parcel of our Codes four different times. (*State ex rel. Board of County Commrs.* v. *Bruce,* supra.)

In the former opinion we determined that the Fort Peck ██ project, and in particular the buildings on the Fort Peck townsite, were needful buildings within the meaning of the federal Constitution. Our position has since been fortified by the decision of the Supreme Court of the United States in the case of *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 58 Sup. Ct. 208, 213, 82 L. Ed. 125, decided December 6, 1937, where it was said: "Locks and dams for the improvement of navigation, which are as clearly within the federal authority as post offices, have been regarded as 'needful buildings.' (*United States* v. *Tucker,* (D. C.) 122 Fed. 518, 522.) We take

that view. We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government.''

In our former opinion we followed the decision of this court ▪ in the case of *State* v. *Tully*, 31 Mont. 365, 78 Pac. 760, 3 Ann. Cas. 824, to the effect that, where the state has given its consent to the purchase of lands by the federal government, the lands so purchased, if used for any of the purposes mentioned in the federal Constitution, ipso facto fall within the exclusive jurisdiction of the federal government, and the state's jurisdiction is thereupon ousted. This view was in accord with expressions found in certain opinions of the Supreme Court of the United States, although these statements when so made were, perhaps, *dicta*. That court, speaking as the source of ultimate authority as to the effect of the purchase of property with the consent of the state, declared in the case of *Silas Mason Co., Inc.,* v. *Tax Com. of Washington,* 302 U. S. 186, 58 Sup. Ct. 233, 244, 82 L. Ed. 154: ''As such a transfer rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a state, which may be acquired irrespective of the consent of the State (*Kohl* v. *United States,* 91 U. S. 367, 371, 372, 23 L. Ed. 449, 451), does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction.'' This language was approved and followed by that court in the case of *Atkinson* v. *State Tax Com.,* 302 U. S. 641, 58 Sup. Ct. 419, 82 L. Ed. 440, decided January 31, 1938. We now adopt the rule of decision as announced by the Supreme Court of the United States, and expressly modify our former decision in this respect.

We indicated the view in our former opinion that reservations or exceptions, such as are found in section 25.1, that is, any reservation in an Act of cession not incompatible with the use for which the lands were acquired, does not operate to destroy the Act as an effective grant of exclusive jurisdiction. While we then found some statements in former opinions of the Supreme Court of the United States to the contrary, which we then regarded as *dicta*, that court has now said of such statements, in the case of *James* v. *Dravo Contracting Co.*, supra, as follows: "There are other *obiter dicta* in other cases, but the point now raised does not appear to have been definitely determined. It is not questioned that the state may refuse its consent and retain jurisdiction consistent with the governmental purpose for which the property was acquired." And the same court further said in the same opinion of the right of the state to qualify its cession by reservations, as follows: "In that event, as in cases of acquisition by purchase without consent of the state, jurisdiction is dependent upon cession by the state, and the state may qualify its cession by reservations not inconsistent with the governmental uses. * * * There appears to be no reason why the United States should be compelled to accept exclusive jurisdiction or the state be compelled to grant it in giving its consent to purchasers."

It is now argued that, in the light of the three recent decisions, relator is entitled to the relief demanded. The court in the *Dravo Case* states the reservation contained in the West Virginia statute as follows: "By a further provision in section 4 the state reserves the right to execute process within the limits of the land acquired, 'and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition.' " And in disposing of the validity of the reservation it said: "In the present case, the reservation by West Virginia of concurrent jurisdiction did not operate to deprive the United States of the enjoyment of the property for the purposes for which it was acquired, and we are of the opinion that the reservation was applicable and effective."

If exclusive jurisdiction was accepted under section 25.1, the contention must be sustained; but if the grant of exclusive jurisdiction was accepted under section 25, the contention is without merit. It cannot be seriously contended that the federal government has not accepted exclusive jurisdiction at some time over the lands of the townsite. We summarized the facts in our former opinion in the following paragraph, relative to the manner in which the governmental affairs of the town of Fort Peck were conducted: "The townsite of Fort Peck is in Valley county. In the fall of 1933 the United States by purchase from the then owners, acquired various tracts of land included within and located in the vicinity of the site of the dam. On lands thus acquired the United States, about December 1, 1933, commenced the laying out of the town of Fort Peck. At its expense it constructed streets, alleys, sidewalks, waterworks, sewers, and buildings for administrative, school, and residential purposes, and for other services proper and convenient for the inhabitants of the town. Buildings were erected for stores and the usual mercantile pursuits, many of them by the United States. All of the lands in the townsite are owned by the United States. Some buildings have been erected on the townsite by individuals or private corporations for the use of the occupants, with the consent and approval of the federal government. The town is not incorporated; it is governed by a town manager who is an officer of the United States Army Corps of Engineers, and a subordinate of the District Engineer under the United States Army Chief Engineer. Fire and police protection is provided by the United States. Water supply, garbage disposal, and sanitation are maintained by the same. School facilities are provided by the Fort Peck Recreational Association. Law violators are prosecuted in the United States District Court of Montana. No elections are held in the town and no registration of electors is conducted there."

The only facts tending to support any other conclusion are as follows: In the winter of 1933–34, contracts were entered into by the United States and various contractors on United States government form No. 51. Article 10 thereof required the con-

tractor to obtain all required licenses and permits. Article 21 required the contractor to furnish compensation insurance for employees on this project and compliance with the Workmen's Compensation Law of the state, territory, or district in which the work was to be performed. Specification No. 22 provided that the contractor would comply with the laws of the United States and of the state as to the inspection of equipment and the licensing of employees. These contracts were entered into prior to the enactment of the Act of Congress of June 25, 1936 (49 Stat. 1938, 40 U. S. C. A., sec. 290). These contracts were on forms provided for general use in governmental activities in the various states, territories, and districts. At no place therein was any reference made to the laws of the state of Montana by direct or special provision. Such provisions in contracts are said to be incompatible with exclusive legislative authority. (*Atkinson* v. *State Tax Com.*, supra.) A state may qualify its ▮▮▮ Act of cession by reservations not inconsistent with the governmental use, and the federal government may accept or decline such grant. (*Silas Mason Co.* v. *Tax Com.*, supra.) A reservation in the Act of cession of a power in the state, such as the right to tax property of others, does not operate to destroy the Act of cession, nor does it prevent the assumption of exclusive jurisdiction by the federal government. (*Fort Leavenworth Ry. Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264.) It must, therefore, follow, that the federal government may accept a less portion of the grant than the entire offer, if agreeable to the state. Here the federal government has furnished most, if not all, of the governmental services usually supplied to dwellers in urban communities in modern times. The state and its various political subdivisions have not supplied these services. The facts, with the one slight exception noted supra, are all to the effect that the federal government has assumed and is exercising exclusive jurisdiction over all of these lands purchased by it.

It is argued that Congress alone has the power to accept the grant of exclusive jurisdiction. Congress by law has authorized the project, the acquisition of these lands, and the expenditure

of funds for the building of the project. It is not indicated by the recent decisions of the Supreme Court of the United States that proof of acceptance of the grant of exclusive jurisdiction can only be made by a specific Act of acceptance by Congress. That court has said, ''Acceptance may be presumed in the absence of evidence of a contrary intent.'' (*Silas Mason Co.* v. *Tax Com.*, supra; *Atkinson* v. *State Tax Com.*, supra.) In the *Silas Mason Case* the failure to perform the usual governmental services was held to evidence an intent not to accept a grant. Here the converse of the situation must lead to the conclusion that the intent was to accept exclusive jurisdiction.

The purchases were made prior to the operative date of section 25.1. The purpose for acquiring the lands was within Article I, section 8, clause 17, of the federal Constitution. The acceptance of the grant in section 25 is presumed unless the contrary intent is established. The facts fail to disclose any such contrary intent; hence, section 25 is the applicable statute, and not section 25.1.

It is argued that section 25, in so far as it may operate to prevent the imposition of taxes for state purposes upon the property of persons and private corporations, is in violation of certain sections of our state Constitution, namely, sections 1, 2 and 11 of Article XII. These sections provide for the levy of uniform taxes upon all the property in the state, except such as is therein exempted, either by the constitutional provision itself, or by the exercise of clearly defined authority vested in the legislature to exempt certain specified classes of property. Admittedly, the property here sought to be taxed is not exempt under these constitutional provisions. It is said that these sections apply to all property within the geographical limits of the state.

The framers of the Constitution were familiar with Article I, section 8, clause 17, as is clearly indicated by Article II of that document. They knew the legislative assembly was the proper body to pass an Act of cession, and they so provided in that article. They adopted the Constitution of the United States, Ordinance I, section 5. The *Fort Leavenworth Case* cited supra, had been decided previously to the writing and

338

adoption of our Constitution. That decision clearly indicated the power of the legislature of the state to include a reservation in an Act of cession. Our state Constitution is a limitation upon the power of the legislature, and not a grant of power unto it. If the framers of the Constitution had intended to limit the right of the legislature in the enactment of Acts of cession within Article I, section 8, clause 17, of the federal Constitution, they would have done so by apt language.

Reservations over which the United States is exercising exclusive jurisdiction, although within the geographical limits of a state, are not within the taxing jurisdiction of the state. (*Standard Oil Co.* v. *California*, 291 U. S. 242, 54 Sup. Ct. 381, 78 L. Ed. 775.)

We conclude that the county taxing officers are without right or authority to tax any of the property within the area of any county over which the United States has assumed exclusive jurisdiction, where the lands were purchased by the United States prior to the passage and approval of section 25.1, Revised Codes. On the land within the purview of section 25.1 which was acquired by purchase or condemnation subsequent to the passage and approval of section 25.1 and all lands which were a part of the public domain, all property located thereon, belonging to persons or private corporations, is subject to taxation. All lands acquired by purchase or condemnation since the enactment of section 25.1 are subject to all reservations and exceptions found in that section.

Since the facts in the instant case do not indicate that there is any property involved except such as is located on lands purchased by the United States prior to the approval of section 25.1, this proceeding is ordered dismissed.

ASSOCIATE JUSTICES STEWART and MORRIS, and HONORABLE GEORGE W. PADBURY, JR., District Judge, sitting in place of MR. CHIEF JUSTICE SANDS, absent on account of illness, concur.

MR. JUSTICE ANGSTMAN, Dissenting:

I was not able to agree with the majority opinion on the prior application for a writ of mandate wherein the same questions

were involved as are here presented. (*State ex rel. Board of County Commrs.* v. *Bruce,* 104 Mont. 500, 69 Pac. (2d) 97.) I then took the view that section 25.1, Revised Codes, is the controlling statute. Decisions by the Supreme Court of the United States rendered since the decision in the *Bruce Case* demonstrate conclusively that section 25.1 is the controlling statute. That court has now held that the transfer by a state of exclusive jurisdiction rests upon a grant, and that such a grant may be accepted or declined. (*Silas Mason Co.* v. *Tax Com.,* 302 U. S. 186, 58 Sup. Ct. 233, 82 L. Ed. 154; *Atkinson* v. *Tax Com.,* 302 U. S. 641, 58 Sup. Ct. 419, 82 L. Ed. 440.) That was simply another way of saying that there must be a meeting of the minds of the grantor and grantee. There must be a voluntary grant by the one and acceptance by the other before exclusive jurisdiction is vested in the latter.

The intention of the state of Montana is expressed in section 25.1, which reads: "That consent to purchase or condemn all necessary lands is hereby given and concurrent jurisdiction shall be, and the same is hereby, ceded to the United States over the Fort Peck Dam, the body of water or artificial lake created by such dam, the land under such body of water, and any lands now owned or which may be hereafter acquired by the United States and which shall touch such body of water, all such being situated in the counties of Valley, Phillips, McCone, Garfield, Petroleum and Fergus, State of Montana, saving, however, to the said state the right to serve civil or criminal process within the limits of the territory over which jurisdiction is so ceded in any suits or prosecutions for or on account of rights obtained, obligations incurred, or crimes committed in said state, within or without said territory, and saving further to the said state the right to tax persons and corporations, their franchises and property within said territory, and reserving further to the said state and its inhabitants, citizens, and non-residents the right to fish or hunt by boat or otherwise, and the right of access, ingress and egress to and through said ceded territory to all persons owning or controlling livestock for the purpose of watering the same, and saving further to the

state jurisdiction in the enforcement of the state laws relating to the duties of the livestock sanitary board, and the state board of health, and the enforcement of regulations promulgated by said boards in accordance with the laws of said state; provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of the state of Montana that they assume police or military jurisdiction over said territory.''

The section expressly treats of the Fort Peck area and none other. It was approved and became effective on January 17, 1934. The grant thus made was accepted on October 10, 1934, by letter of the Acting Secretary of War, who pursuant to the requirement of section 25.1 notified the Governor of Montana that the lands indicated on a map which he inclosed with his letter were in the possession of the United States, and in which he stated in part: ''The nature, character and extent of the work at the locality is such that the United States must now assume police jurisdiction over the lands thereinbefore described. It is my duty, therefore, to issue instructions to the federal officials in charge of the work that they shall assume complete and exclusive jurisdiction over these lands. I shall appreciate your co-operation in so advising the officials of your state.'' The lands embraced the area here involved.

We need not here indulge in any presumption regarding the acceptance of the grant. The letter of October 10, 1934, written long after the passage of section 25.1, shows acceptance of the grant under section 25.1, and there is nothing to indicate acceptance of a supposed grant under section 25. The controlling statute being section 25.1, the state's right to tax personal property in private ownership situated thereon is conceded by all the parties, since the state has the right to qualify its consent to purchase or its grant of jurisdiction, as it has in section 25.1. (*James* v. *Dravo Contracting Co.*, 302 U. S. 134, 58 Sup. Ct. 208, 82 L. Ed. 125.)

The time when the government acquired ownership of the lands, under the reasoning of the recent opinion of the United States Supreme Court cited above, becomes immaterial. The

test is, When did the United States Government accept the grant of exclusive jurisdiction over the area? The answer is on October 10, 1934, when it accepted the grant and there came about a meeting of the minds of the two contracting governments.

My associates are falling into the same error here as they did in the *Bruce Case*, supra, by holding in line with the case of *State* v. *Tully*, 31 Mont. 365, 78 Pac. 760, 3 Ann. Cas. 824, that the purchase by the United States, with the consent of the state, ipso facto brought the lands within the exclusive jurisdiction of the United States. The federal court refused to adhere to the rule announced in the *Tully Case*. (*United States* v. *Tully*, (C. C.) 140 Fed. 899.) The United States Supreme Court, in the recent cases above cited, in effect exploded that doctrine completely.

My associates point out at length what the United States is doing in the way of exercising exclusive jurisdiction over the area in the matter of furnishing fire and police protection, school facilities, and the like. All of this was accomplished after the passage of section 25.1 and, together with the letter of October 10, 1934, undoubtedly shows an acceptance of the grant, but under section 25.1, and not under section 25.

My associates say, "We now adopt the rule of decision as announced by the Supreme Court of the United States [meaning as announced in the three recent decisions], and expressly modify our former decision in this respect." As I read the majority opinion, it makes this declaration of purpose to follow the recent decisions of the United States Supreme Court, and then proceeds to do the exact opposite.

If, as the majority hold, because the United States commenced the laying out of the town of Fort Peck before the passage of section 25.1, there was an acceptance of the grant of exclusive jurisdiction, and if, as they hold, because of the case of *Hurley* v. *Kincaid*, 285 U. S. 95, 52 Sup. Ct. 267, 76 L. Ed. 637, the mere commencement of work in carrying out a proposed government project constitutes a purchase of the lands threatened to be invaded by the project (points which I do not concede),

342

then the attempt in the *Bruce Case* to restrict the operation of the opinion to only a part of the area involved in the Fort Peck project was and is futile. The logical conclusion from the majority opinion is that section 25.1 has absolutely no application to any of the area contemplated by its terms.

If the majority opinion here is correct, then the attempt by section 25.1 to reserve the right in citizens of Montana to fish and hunt on the territory involved is also an idle gesture. A person holding a Montana fishing license, when caught fishing in the proposed lake, will be met with the assertion that "your license is good only in Montana. This body of water is no longer a part of Montana."

But it may be said that the United States will not become interested in that question; that, even if it has the power to regulate fishing and hunting, it will not do so. History teaches that the federal government does not permit many of its powers to lie dormant. It exercises about all of the powers it possesses, and some that it does not. A notable example is that of the Federal Motor Carrier Act of 1935 (49 Stat. 543, 49 U. S. C. A., sec. 301 et seq.), whereby the federal government, without the consent of the states, undertakes to regulate, control, and supervise the use of state-owned highways as a place on which to engage in interstate commerce. It possesses about as much authority to do so as the state of Montana has to regulate, supervise, and control the use of federal-owned highways in intrastate traffic through and across Fort Missoula and Fort Peck without the consent of the United States.

As before stated, I think section 25.1 is controlling here, and that the exclusive jurisdiction of the United States is subject to the reservations therein contained.

Let us revert to section 25. It contains this proviso, "provided, that an accurate map or plat and description by metes and bounds of said land shall be filed in the office of the county clerk and recorder of the county in which the same are situated, and if such lands shall be within the corporate limits of any city, such map or plat shall also be filed in the office of the city clerk of said city." In the *Bruce Case* the majority held

that the word "provided" means "and." If that is so, it would still have to be held that there is no acceptance of the grant of exclusive jurisdiction by the United States until the acceptance is manifested by the filing of that map. I think a liberal construction of section 25 requires a holding that there is no acceptance of the grant without the filing of the map. Otherwise, the clause is given no meaning at all. In my opinion, all of the evidence points to the conclusion that section 25.1 and not section 25, is controlling.

Moreover, even if section 25 is the controlling statute here, I fail to see wherein the state is invading the exclusive jurisdiction of the United States by taxing personal property in private ownership situated on the area here involved. It is true that the cases of *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 50 Sup. Ct. 455, 74 L. Ed. 1091, and *Standard Oil Co.* v. *California,* 291 U. S. 242, 54 Sup. Ct. 381, 78 L. Ed. 775, and prior cases of like import, sustain the view that the state has not that right. But the three recent decisions of the United States Supreme Court have greatly modified all prior opinions. In my opinion, the *Surplus Trading Company* and the *Standard Oil Cases* are erroneous and should be overruled. They, and prior cases, hold that when the United States purchases places with the consent of the state, it withdraws such area from the state and creates a separate province or country. If that is the meaning of clause 17, section 8, of Article I, of the United States Constitution, then it would not be competent for Congress to say otherwise. If the Constitution commands one result, Congress cannot prescribe another. If the Constitution declares that purchase and consent withdraw the place from the state, then it is not competent for Congress or any other federal officer to accept the grant on any other basis.

The constitutional provision in question should be given its ordinary meaning. It should be construed so as to carry out its purpose. It was intended to avoid clashes or conflicts between the United States and the respective states as to the extent of authority of each. If the two governments involved were satisfied with the division of authority between them, it

was never contemplated that an individual could question the arrangement and assert rights or exemptions growing out of the exclusive legislation of the United States. In other words, occasionally Congress possesses powers which it has not seen fit to exercise, and in such a situation the states are free to act. (Compare *South Carolina State Highway Department* v. *Barnwell Bros.*, 303 U. S. 177, 58 Sup. Ct. 510, 82 L. Ed. 469, and cases therein cited, decided by the United States Supreme Court on February 14, 1938.)

Did the framers of the Constitution intend that the mere purchase of property by the federal government, with the consent of the state, for needful buildings, automatically created a separate province, country, or territory having an autonomous existence such as the District of Columbia, and did they intend that such area should be carved out and excluded from the state in which situated? I think not. If that were intended, apt language could easily have been employed. Unless this area has been excluded from the state of Montana, personal property in private ownership situated thereon is taxable. (*Forbes* v. *Gracey*, 94 U. S. 762, 24 L. Ed. 313.) If the Constitution means what the United States Supreme Court in its earlier decisions has said it means, then it would not be competent for Congress to authorize a purchase of property for needful buildings by consent of the state without excluding the area from the state in which it is located. Congress, however, has undertaken to prescribe a different rule relative to purchasers under the Resettlement or Rural-Rehabilitation Projects. This enactment is found in 40 U. S. C. A., section 431, reading: ''The acquisition by the United States of any real property acquired before or after June 29, 1936, for any resettlement project or any rural-rehabilitation project for resettlement purposes constructed before or after June 29, 1936, with funds allotted or transferred to the Resettlement Administration pursuant to the Emergency Relief Appropriation Act of 1935, or any other law, shall not be held to deprive any State or political subdivision thereof of its civil and criminal jurisdiction in and over such property, or to impair the civil rights under the local

law of the tenants or inhabitants on such property; and insofar as any such jurisdiction has been taken away from any such State or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such State or subdivision.'' Obviously, if the Constitution says one thing and Congress the exact opposite, the congressional utterance must fall. Section 431 cannot possibly stand if the Constitution means what the court in its earlier decisions has said it means.

I concede that the United States has exclusive legislation over the area in question here as the Constitution commands, but I do not agree that its jurisdiction or authority is invaded by taxing personal property owned by private individuals and situated on such lands when the tax in no way affects, hinders, or impedes the government of the United States in carrying out the purposes for which the lands were acquired, as here, and this whether section 25 or section 25.1 is controlling.

Under the laws of Montana a tax upon personal property is a lien upon the real estate of the owner. (Sec. 2153, Rev. Codes.) To effect the collection of a personal property tax it may be, and usually is, unnecessary for the taxing officers to go near the property assessed. There need not be any invasion of the jurisdiction of the federal government. If it be necessary to serve civil process to effect a collection of the tax, that right is reserved under section 25, and there is no showing here made that such a procedure would be ''incompatible with the cession'' made under section 25. At any rate, the United States government, and not the taxpayer, should complain when that is attempted. Under our statutes personal property is taxable as of 12 o'clock noon on the first Monday of March. (Secs. 2002, 2003, Rev. Codes.) Ownership of personal property situated in Montana at 12 o'clock M. on the first Monday of March determines its taxability by the state. If a band of sheep grazing near the Fort Peck area, either with or without permission of the officers in charge at Fort Peck, is driven through the Fort Peck area on the first Monday of March and in such a manner that at 12 o'clock noon on that day the en-

tire band is on that area, and ten minutes thereafter the sheep are removed therefrom and never again enter it, they are not taxable for that year according to the earlier United States Supreme Court decisions, upon the ground that at noon on the first Monday in March of that year they were not in Montana. I cannot subscribe to that view.

I can see no real difference, in principle, between this case and that of *Cosier* v. *McMillan, County Treasurer*, 22 Mont. 484, 56 Pac. 965, and I believe we should hold that the property in question here is taxable even though section 25 be held to be the controlling statute.

I admit that, if section 25 is the controlling statute, then my views are at variance with the *Surplus Trading Company Case* and the *Standard Oil Company Case,* and other early decisions of the United States Supreme Court. However, as noted above, those early cases have been modified by the last three decisions of that court, and in my opinion should be completely overruled.

Ordinarily, I would be reluctant to depart from or express views at variance with the holding of the United States Supreme Court, but since the decision in the case of *Mountain States Power Co.* v. *Public Service Com.*, 299 U. S. 167, 57 Sup. Ct. 168, 81 L. Ed. 99, I have no hesitancy in so doing. By that decision the United States Supreme Court held with remarkable brevity that its condemnation of a state statute is not binding on state courts; it declared that its condemnation of a state statute is not authoritative condemnation; it held that what it says concerning one statute is not controlling as to another meaning exactly the same, but containing a different Code number; it found that the federal court was warranted in entering a restraining order contrary to the state statute, which statute was just as obligatory upon the federal as upon the state courts (25 C. J. 828, 829, note 52), on the theory that the state statute was unconstitutional as denying an essential remedy, but that the state courts were free to declare the state statute valid notwithstanding its pronouncement to the contrary. It invited the state courts to speak independently and uninfluenced by what it had said on a given subject. Moreover, the

state courts remaining silent, it (the United States Supreme Court) will presume that, had the state court spoken, it would have done so on the side of error. (Compare analysis of that opinion in 50 Harvard Law Review, pp. 813–818.) On the strength of this invitation to speak, as one member of this court, I have no hesitancy in expressing my disapproval of the *Surplus Trading Company* and the *Standard Oil Company Cases*.

I have given no consideration to the questions of *res judicata* or *stare decisis*, as they are not treated in the majority opinion. Making the same assumption regarding these questions as do the majority, I think the writ applied for should issue.

Cause taken to Supreme Court of the United States by writ of certiorari June 9, 1938.